JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Jimmie Carter appeals from his classification as a sexual predator. His sole assignment of error is that the court lacked sufficient evidence to make the classification. We conclude that the court relied *Page 3 
on competent, credible evidence to classify appellant as a sexual predator. We therefore affirm.
 {¶ 2} A sexual predator is defined as a person who has been convicted of or pleaded guilty to committing a sexually oriented offense that is not a registration-exempt sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses. R.C.2950.01(E)(1).
 {¶ 3} R.C. 2950.09(B)(3) sets forth numerous factors to guide the court's determination under R.C. 2950.01(E)(1). The court must consider all relevant factors, including those set forth in R.C. 2950.09(B)(3). The court may, however, find an offender to be a sexual predator even if "only one or two statutory factors under R.C. 2950.09(B)(3) are present, so long as the totality of the relevant circumstances provides clear and convincing evidence that the offender is likely to commit a future sexually-oriented offense. " State v. Randall (2001),141 Ohio App.3d 160, 166. Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 4} Our review of a sexual predator classification is limited to determining whether the weight of the evidence supports the classification. *Page 4 
Sexual predator classifications that are supported by competent, credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence. State v. Hills, Cuyahoga App. No. 78546, 2002-Ohio-497.
 {¶ 5} Appellant pleaded guilty in three different rape cases. Police reports admitted into evidence showed that one of the victims was appellant's two-year-old daughter. The daughter lived with her mother. The police report states that the child told her grandmother that after a visit with appellant, he had "bothered her `coo coo' Vagina." The child's mother took the child to the doctor and learned that the child contracted gonorrhea. The child's mother told the police that appellant had been her only recent sexual partner and that, she too, had contracted the disease.
 {¶ 6} The other two victims were appellant's former girlfriends. The first girlfriend told the police that as she was leaving school, appellant approached her and said that he wanted to speak to her. When she refused, appellant forced her onto a public bus. He took her to his residence and then slapped and punched her, saying that "he wanted to have sex with her." She refused because she did not want to resume a relationship with him, but appellant again slapped her. During the rape, he told her that "anytime he wanted her, he would take it and if she ever refused or told anyone, he would kill her and her baby." She told the police that after the rape, he called her residence to inform her that *Page 5 
"whenever he wants to, he will come and rape her again and if she ever told, he would kill her."
 {¶ 7} The second former girlfriend told the police that she had dated appellant during high school. She became pregnant, but aborted the pregnancy, apparently over appellant's objections. Five years later, appellant appeared at her door. He had covered the peephole, making the second former girlfriend believe that he was her husband. After being allowed in, appellant began arguing with the second former girlfriend, saying that she should not have had an abortion. Appellant struck her in the face, drawing blood. When she asked appellant why he struck her, he told her that "he had been wanting to do that for a long time." Appellant then raped her. She tried to escape by running outside to the street and screaming for help. Appellant followed her and began to beat her face into the ground before dragging her back into the house and raping her again. When finished, he told her that he wanted to go back to jail. He asked her to get a knife and kill him. When she refused, he fled.
 {¶ 8} In an interview with a social worker from the court psychiatric clinic, appellant admitted to one of the offenses against the second former girlfriend, and after initially denying his involvement with the first former girlfriend suggested that he might have "intimidated" her into having sex. He denied raping his own daughter, however, and claimed that he pleaded guilty to *Page 6 
that offense "to help me get paroled faster." Appellant detailed a history of substance abuse and claimed to have been molested as a child.
 {¶ 9} The court heard evidence relating to appellant's prison conduct. He was ejected from the Magellan program for sexual offenders because he made threats to kill another inmate. He had multiple disciplinary segregations for fighting, threatening, assault, attempting to establish relationships with staff, threatening staff, disobeying orders, and testing positive for drugs. The report also stated that appellant received about 40 tickets for behavior which included "fighting, consensual sex, threats, attempting to establish a relationship with a female staff person, dirty urine * * *." Appellant's prison file indicated that he may have been involved in a sexual relationship with his cellmate during his incarceration. On one occasion, appellant severely beat the cellmate in what he characterized as a "lover's quarrel." Appellant firmly denied engaging in homosexual relations, and said that he had been prostituting his cellmate to other inmates only to find that the cellmate had not given him his share of the proceeds. He explained that he identified the beating as a lover's quarrel in order to avoid the institutional consequences of pimping.
 {¶ 10} The social worker diagnosed appellant with antisocial personality disorder and polysubstance dependence. A Static-99 assessment placed appellant in the "moderate-low" risk category for sexual recidivism, showing that persons within this category have a 12 percent chance of reoffending in five *Page 7 
years, a 14 percent chance of reoffending in ten years, and a 19 percent chance of reoffending in 15 years. An Abel Assessment of sexual interest showed appellant had a sexual interest in adolescent and adult females, with no indication of a sexual interest in children.
 {¶ 11} The court fully considered the factors set forth in R.C.2950.09(B)(3). It made the following findings:
 {¶ 12} "The Court makes its determination based on the assessment of risk factors, most significantly the presence of substance abuse, the unrelated victims, he's not married, failure to complete treatment, and his antisocial personality disorder outweigh the mitigating factors that here were [sic] no male child victims, or deviant sexual preference, or the defendant's age, the measured sexual interest in children based on the [Abel Assessment], or the fact that there weren't prior offenses before these three charges, these three separate charges."
 {¶ 13} This recitation shows that the court considered all applicable factors when making the classification. Those factors it did rely on — his substance abuse, failure to complete treatment and anti-social disorder — coupled with the violent nature of the three offenses he pleaded guilty to, were supported by competent, credible evidence in the record. The findings also negated the court's need to make explicit findings on other factors listed under R.C. 2950.09(B)(3), *Page 8 
although the court did say that it considered all of the factors when ruling on the classification.
 {¶ 14} Appellant rather optimistically cites to the results of the Static-99 which show that he has an 81 percent chance of not reoffending in the next 15 years. He maintains that these results show that he is not likely to reoffend in the future. The utility of the Static-99 has been questioned because that test "cannot purport to make an individualized assessment of future conduct any more than a life expectancy table can provide a accurate prediction of a particular individual's longevity." State v. Ellison, Cuyahoga App. No. 78256, 2002-Ohio-4024; State v. Hardges, Cuyahoga App. No. 88126,2007-Ohio-1158. Even if the Static-99 could accurately predict appellant's future conduct, we believe that his one in five chance of committing a sexually oriented offense in the next 15 years could be viewed as unacceptably high, particularly when viewed against his past history of violent sexual offending and continuing anger and substance abuse issues. Even while incarcerated, he engaged in violent behavior and drug use, while receiving discipline for attempting to engage in relationships with prison staff. He further showed an inability to complete sexual offender counseling in prison due to threats he made against fellow inmates. All of these factors were sufficient to enable the court to find that appellant was likely to engage in one or more sexually oriented offenses in the future. The court did not lose its way by reaching this conclusion. *Page 9 
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ANTHONY O. CALABRESE, JR., P.J., and MARY J. BOYLE, J., CONCUR *Page 1